UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENA LEATH,

        Plaintiff,

v.

SECRETARY OF UNITED STATES
DEPARTMENT OF VETERANS
AFFAIRS,

        Defendant.

_____/

Case No. 2:23-cv-11407

Honorable Susan K. DeClercq
United States District Judge

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (ECF No. 20)**

Dena Leath is a Black woman, veteran, and former Detroit Police Department Officer. In July 2018, she joined the Ann Arbor Veterans Affairs (VA) Police Department as its only criminal investigator. At the time, she was one of two Black officers on the force and the only female officer. Leath quickly found the environment at her new job to be less than welcoming, and she ended up butting heads with several other officers. Three years later, things reached a point where Leath felt compelled to resign. After resigning, Leath sued her former employer under Title VII, alleging that she was retaliated against, subjected to a hostile work environment, and forced to resign due to intolerable race and gender discrimination. The Government now moves for summary judgment, arguing that Leath cannot

satisfy the elements of her claims as a matter of law. As explained below, the Government is correct, so its motion will be granted.

## I. BACKGROUND

Dena Leath is a Black woman who worked as a criminal investigator for the VA Police Department at the Ann Arbor VA hospital from July 2018 to May 2021. ECF Nos. 12 at PageID.109; 20-2 at PageID.230. Leath's duties included investigating crimes and working with state and local prosecutors to bring charges when appropriate. ECF No. 20-2 at PageID.230–31. Although Leath supervised investigatory tasks, she did not have direct reports. *Id.* at PageID.231. At the VA, Leath's police rank was Captain. *Id.* at PageID.235. James Myers, Deputy Chief at the Ann Arbor VA, was Leath's direct supervisor. *Id.* at PageID.268, 273. Gregory Allen, Chief of the Ann Arbor VA Police Department, was Leath's second-level supervisor.

***Comments at staff meeting.*** In September 2018, the Ann Arbor VA Police Department held its first all-staff meeting after hiring Leath for the Department's only criminal-investigator position. ECF No. 20-4 at PageID.294. Officers Shane Haynes and Robert Ettinger, both white men, expressed concerns in the meeting that there had been qualified internal applicants for the criminal-investigator position and that internal applicants should have been given the opportunity to apply before the position was advertised externally. *Id.* Leath testified that Ettinger told Chief Allen,

- 2 -

"I don't know why you went to the outside to get somebody [when] we have qualified people here." ECF No. 20-2 at PageID.232. Leath said that Haynes then turned and looked at her "with a mean look." *Id.* Leath testified that the comments upset and humiliated her, and that she left the meeting in tears. ECF No. 20-2 at PageID.232. Leath did not recall anyone addressing her or using her name in the meeting. *Id.* at PageID.233.

**Confrontation at salad bar**. In October 2018, Leath attended a VA police training in Little Rock, Arkansas, with other officers, including recently hired Ann Arbor VA Officer James Victorian, a Black man. ECF Nos. 12 at PageID.110; 20-2 at PageID.238–39. Leath testified that while standing in line in the cafeteria, she confronted Victorian because he added ingredients to a premade salad and did not pay for the extra ingredients. ECF No. 20-2 at PageID.239. Leath asserts that Victorian looked at her and said, "That's petty," and then added, "That's why the guys don't like you." *Id.* at PageID.239. Victorian remembers the incident as concerning a container of salad dressing that he mistakenly believed was complimentary. ECF No. 20-5 at PageID.320. But he disputes that Leath confronted him in line, testifying that he learned of her accusation through other officers. *Id.*

**Leath's compliance with VA evidence procedures**. In late December 2018, Leath was given a cell phone that contained evidence related to an employee being investigated for fraud. ECF No. 20-2 at PageID.243. Leath left the phone in her

office, locked in a desk drawer, for at least a weekend. *Id.* at PageID.245. Proper chain-of-custody procedure, however, was to take the phone to the evidence room and have an evidence technician check the phone in. *Id.* at PageID.243. Leath offered several explanations for why she deviated from standard procedure, including that it was the holiday break, that the chief was off, and that the person being investigated allegedly had friends within the Department. *Id.*

Nearly a year later, in November 2019, Officer Ettinger referenced the phone evidence issue to Zenia Berry, an Equal Employment Opportunity (EEO) specialist who was conducting a fact-finding investigation on the Department's workplace culture. *See* ECF No. 20-6. Ettinger told Berry that Chief Allen played favorites, *id.* at PageID.344, citing as an example that "[Leath] kept evidence in her purse and desk drawer for approximately a week, violating the chain of custody and proper handling of evidence, [but] no discipline was proposed." *Id.* Nothing in the record suggests that Ettinger discussed this issue with anyone but Berry. Leath asserts that this was a gender-based comment because Ettinger referenced a purse. ECF No. 20-2 at PageID.247.

***Dispute over mailbox access****.* Leath and Officer Victorian (from the salad bar) again butted heads on January 10, 2019. Leath was trying to access a mailbox in the police-operations area when Victorian, sitting in a chair adjacent to the mailbox, did not move out of Leath's way quickly enough. Leath wrote a report of contact

documenting the exchange. ECF No. 20-7 at PageID.347. Victorian accused Leath of having an attitude, and Leath stated that she should not have to explain her needs to him. *Id.* Leath reported the incident to Captain Matthew Hester, the day-shift supervisor. *Id.* at PageID.348. Victorian also wrote a report of contact, accusing Leath of being rude and confrontational. ECF No. 20-8 at PageID.349. Officer Haynes, who witnessed the incident, also wrote a report of contact. ECF No. 20-9 at PageID.350. Deputy Chief Myers discussed the incident with Leath and then emailed her stating that the "expectation of management is that we are all professionals and we need to do our best to get along with our co-workers." ECF No. 20-10 at PageID.351.

*Argument over warrant papers*. Leath and Victorian clashed again in April 2019, when Leath complained that the pages of a warrant request that Victorian drafted were out of sequence. ECF Nos. 12 at PageID.112; 20-2 at PageID.241. Leath asked another officer to get Victorian to fix the pages. ECF No. 20-2 at PageID.241, 252. Leath says that Victorian became upset and screamed at her that he had been an officer for 30 years and knew what he was doing. *Id.* at PageID.241, 252–53. Leath did not make Chief Allen or Deputy Chief Myers aware of the incident. *Id.* at PageID.253. Victorian claimed he has no memory of the event. ECF No. 20-5 at PageID.242–43.

***Accusations that Leath misstated her hours***. On September 19, 2019, Officer Haynes sent Captain Hester an email accusing Leath of misstating her hours for September 12, 2019. ECF No. 20-11 at PageID.352. Hester forwarded the email to Deputy Chief Myers, who conducted a fact-finding and concluded that the accusation was unfounded. *Id.*

***First independent investigation into workplace environment***. In November 2019, EEO Specialist Zenia Berry from the Detroit VA was assigned to conduct a fact-finding investigation into complaints by multiple Ann Arbor VA Police Department employees about the workplace environment in 2018 and 2019. ECF No. 20-12 at PageID.353.[1] Berry interviewed 29 members of the Department, including Leath. *Id.* at PageID.354–55; ECF No. 20-2 at PageID.256.

Berry's investigation found issues with staffing shortages, Department morale, and the management style of Chief Allen. ECF No. 20-12 at PageID.356–58. Berry's report stated that "witnesses attributed the shift in morale to some individuals being unhappy regarding non-selection for promotions within the service, however, the decrease was especially evident to witnesses after the selection

---

[1] Leath often refers to this fact-finding investigation as an EEO investigation, but Diana Cass, the EEO coordinator for the Ann Arbor VA, explained to Leath in a September 14, 2020, email that the fact-finding investigation was not sparked by a formal EEO complaint, was not an EEO investigation, and that Berry was brought in not because she was an EEO specialist, but because she was a neutral party from another VA. ECF No. 20-13 at PageID.359–60.

of an external candidate, Captain Dena Leath, for the position of Criminal Investigator." *Id.* at PageID.357. Witnesses confirmed that Officers Haynes and Ettinger expressed concerns at the all-staff meeting that they felt internal applicants were more qualified than Leath. *Id.*

Berry concluded that while there were elements of tension and division within the Department, the evidence did not show a hostile work environment. *Id.*

Leath shared with Berry the incidents that had happened up to that point—the staff meeting, the salad conflict, the mailbox conflict, and the time-fraud accusation. ECF No. 20-2 at PageID.256. Leath told Berry that she felt that she was being targeted and subjected to a hostile work environment based on her gender and race. *Id.* Leath believed that Berry, a Black woman, conducted a fair investigation, but did not get the full picture because other employees did not speak up for Leath. *Id.* at PageID.245, 256.

***Leath receives a warning for illegally parking***. On January 10, 2020, Officer Haynes issued a "Courtesy Violation Notice" to Leath's car for parking in a no-parking area. ECF No. 20-14 at PageID.361. A Courtesy Violation Notice is a warning. ECF No. 20-3 at PageID.276–77. Leath does not deny parking illegally, but she believes that other officers were also parked illegally, and that Haynes targeted her specifically. ECF No. 20-2 at PageID.257. Haynes stated that at the time he issued the notice, Leath's car was the only one in the area parked illegally and

- 7 -

that he did not know it belonged to Leath. ECF No. 20-4 at PageID.298. Ultimately, the Courtesy Violation Notice was not entered into the VA reporting system. *Id.*

*Not using Leath's official title.* In May 2020, Leath complained to Chief Allen that Officer Haynes was not using her official title in police reports or other official documents but was instead referring to her as Dena Leath. ECF No. 20-15 at PageID.373–74. On June 16, 2020, Chief Allen emailed all of his supervisor leadership on several issues to be addressed within their shifts, including that officers should be addressed in their official capacity, such as with "Officer," "Lieutenant," or "Investigator." ECF No. 20-16 at PageID.383.

*Books placed in Leath's mailbox.* On July 6, 2020, Leath found two books that she described as "older Criminal Investigator books" placed in her mailbox. ECF No. 20-17 at PageID.384. Leath believed the materials were placed in her mailbox as "an intended joke" and was "very upset and disappointed" by the action. *Id.* Leath emailed Chief Allen and Deputy Chief Myers, writing that the materials in her mailbox were "not acceptable at all" and demanding "an apology or explanation." *Id.* Leath later elevated her rhetoric in a conversation with Deputy Chief Myers, stating that she believed that someone was trying to harass her and that placing the items in her mailbox constituted a criminal offense. ECF Nos. 20-18 at PageID.385; 20-19 at PageID.390.

- 8 -

Deputy Chief Myers reviewed the relevant video-camera footage of the police-operations area. ECF No. 20-18 at PageID.385. The footage showed that Officer Victorian placed the books in Leath's mailbox. *Id.* Deputy Chief Myers interviewed Victorian, who stated that he found the books in the office, thought Leath might want them, and so he put them in the mailbox. *Id.* Victorian later testified that he did not know whether the books were Leath's but believed they could have been, and that even if they were not, they might pertain to her job. ECF No. 20-5 at PageID.325. No further action was taken regarding the books.

***Leath files a report of contact against Officer Haynes***. On July 14, 2020, about a week after the book incident, Leath filed a report of contact claiming that Officer Haynes had given her a "very cold intimidating look" while she was walking out of the police-operations room that morning. ECF No. 20-20 at PageID.413. She claimed that Haynes gave her another intimidating look later in the day. *Id.* Leath stated that she did not feel comfortable or safe around Haynes and that she believed officers Haynes and Victorian had "a problem" with her being a Black woman, and that they were attempting to bully or intimidate her. *Id.*

A month later, in August 2020, Leath also submitted her version of the mailbox incident and restated the issues laid out in her July report of contact to the VA's "Disruptive Behavior Reporting System." ECF No. 20-21 at PageID.414–15.

- 9 -

The "Disruptive Behavior Reporting System" is a tool outside the Police Department to report disruptive behavior at the VA. ECF No. 20-19 at PageID.388–89.

*Second independent investigation into workplace environment*. On July 27, 2020, Leath called William Robinson, the Regional VA Police Chief over the Ann Arbor VA Police Department. ECF Nos. 20-22 at PageID.416–20; 20-15 at PageID.375. Leath told Chief Robinson about the above-listed incidents and that she felt that she was being harassed. ECF No. 20-15 at PageID.375–76. Chief Robinson then began an investigation into her allegations. ECF No. 20-4.

Robinson emailed Leath on September 4, 2020, and informed her that he and LeCario Johnson, a Regional Deputy Chief, had found no evidence to support her allegations of harassment, hostile work environment, or criminal acts. ECF No. 20-23 at PageID.421. Chief Robinson issued a report documenting Leath's allegations and his investigation and findings. ECF No. 20-4. While the report found that many of the events described by Leath occurred, it did not find that the events were evidence of harassment or a hostile work environment. *Id.* at PageID.300. The report concluded that there appeared "to be an element of tension and division among employees in the department" and made several recommendations. *Id.*

*Argument over Miranda warnings*. On September 12, 2020, Leath got into an argument with Victorian and two white male officers, Sean Barrett and Keith Wilhoite, over proper *Miranda* warning procedures when dealing with criminal

suspects. Leath, Victorian, and the two officers all wrote reports of contact about the incident. ECF Nos. 20-24 at PageID.422; 20-25 at PageID.423–24; 20-26 at PageID.425–26; 20-27 at PageID.427–28. All agree that Leath was explaining *Miranda* procedures to a new officer, because she believed that he had not followed proper procedures while interviewing a suspect the previous day. When Barrett and Victorian disagreed with one aspect of Leath's view of *Miranda* procedures, an argument broke out. The other officers described Leath as agitated, hostile, and condescending. Leath acknowledged that her statements in Victorian's report of contact were "in the ballpark" of what she said that day, ECF No. 20-19 at PageID.397, but denied that she was aggressive, patronizing, or used a scathing tone, instead calling her manner "firm" and "direct," *id.* at PageID.398.

Captain Brandon Tasker investigated the *Miranda* incident. ECF No. 20-28 at PageID.429–33. Captain Tasker interviewed the parties and reviewed video, which he wrote showed "a casual conversation." *Id.* at PageID.430. Tasker did not believe that disciplinary action was appropriate for what he described as "a petulant personal conflict," but noted that "there seems to be consistent conflict" between Victorian and Leath, and that each believed "that management staff are siding with the other on these various incidents." *Id.* at PageID.433. Captain Tasker stressed that Leath and Victorian needed to speak to each other more professionally, maintain a business-like mentality, and not impugn each other. *Id.*

***Leath files an EEO claim based on race and gender discrimination, and***
***then resigns***. Leath filed a formal EEO claim on October 23, 2020, asserting gender
and race discrimination in the form of harassment and a hostile work environment.
ECF No. 20-29 at PageID.434. The EEO investigator issued his report March 17,
2021. ECF No. 20-22 at PageID.416–20.

Leath resigned from her position with the Ann Arbor VA Police Department
on May 23, 2021. ECF No. 12 at PageID.116. Chief Allen did not want her to leave
and thought she did a good job during her tenure. ECF No. 20-3 at PageID.278.

***Leath's EEO claims are denied both initially and on appeal***. The VA denied
Leath's EEO claims on September 16, 2021, concluding that there was no evidence
that the incidents raised by Leath were motivated by her race or sex. ECF No. 20-30
at PageID.443. The decision further observed that even if the conduct occurred as
alleged and was based on Leath's protected class, the events alleged were not
sufficiently severe or pervasive to constitute harassment under federal law. *Id.* Leath
appealed to the United States Equal Employment Opportunity Commission (EEOC).
ECF No. 20-31 at PageID.446–52. The EEOC panel held that the conduct at issue
was insufficiently severe or pervasive to create a hostile work environment and that
the challenged conduct was not motivated by race or sex. *Id.* at PageID.450.

***This lawsuit***. On June 13, 2023, Leath sued the United States Secretary of Veterans Affairs[2] and Officers Victorian and Haynes. ECF No. 1. She later dropped her claims against Officers Victorian and Haynes, ECF No. 9, and amended her Complaint twice, ECF Nos. 2; 12. Count I of Leath's Second Amended Complaint ("the Complaint"), ECF No. 12, alleges "Title VII Violation," which this Court generously construes as asserting claims for retaliation, hostile work environment, and race and gender discrimination, *id.* at PageID.116–17. Count II asserts a standalone claim for "Constructive Discharge." *Id.* at PageID.117–18.

In April 2024, the Government filed a motion for summary judgment, ECF No. 20, which was fully briefed, ECF Nos. 22; 23. A hearing on the motion is not necessary. E.D. Mich. LR 7.1(f)(2).

## II. LEGAL STANDARD

To prevail on summary judgment, movants must identify record evidence showing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a). If the movant makes such a showing, then the burden shifts to

---

[2] At the time this case was filed, Denis R. McDonough was the Secretary of Veterans Affairs. But as of February 2025, the Director is Doug A. Collins. Under Civil Rule 25, the substitution of Collins for McDonough was automatic. See FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more than a mere "scintilla of evidence," *id.* at 251, and more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine whether any party must prevail as a matter of law. *See Anderson*, 477 U.S. at 251–52.

### III. DISCUSSION

#### A. Standalone Claim for Constructive Discharge

In Count II of her Complaint, Leath attempts to assert a standalone claim for "constructive discharge." ECF No. 12 at PageID.117–18. But constructive discharge "is not an independent cause of action." *Donnelly v. Health Mgmt. Sols., Inc.*, No. 2:19-CV-5303, 2022 WL 22883109, at *3 (S.D. Ohio Feb. 8, 2022) (citing *Huston v. Mittal Steel USA*, No. 2:06-CV-552, 2006 WL 2709776, at *4 (S.D. Ohio Sept. 20, 2006)); *Ritter v. Bd. of Educ. of Arcadia Loc. Schs.*, 535 F. Supp. 3d 690, 694 (N.D. Ohio 2021) (same); *Hogwood v. Town of Oakland*, No. 11-2396, 2012 WL 1414000, at *3 (W.D. Tenn. Apr. 23, 2012) (same) (collecting cases).

Rather, constructive discharge is "a means of proving the element of an adverse employment action where the employee quits instead of being fired" in the context of an employment discrimination claim. *Huston*, 2006 WL 2709776, at *4.

- 14 -

In this way, constructive discharge still "requires an underlying cause of action for employment discrimination." *Id.* (citing *Kroll v. Disney Store, Inc.*, 899 F. Supp. 344, 347 (E.D. Mich. 1995)).

Leath responds that the Supreme Court held that constructive discharge is an independent cause of action in *Green v. Brennan*, 578 U.S. 547, 555 (2016). ECF No. 22 at PageID.467–68. But *Green* says no such thing. *See Doe v. New Castle Cnty.*, No. CV 21-1450, 2023 WL 7921367, at *2 (D. Del. Nov. 16, 2023) (explaining that *Green* holds only that constructive discharge is "a separate claim" for purposes of determining when the limitations period begins to run, not that constructive discharge is an independent cause of action); *Schrof v. Clean Earth, Inc.*, No. CV-22-1533, 2023 WL 3763984, at *7 (D. Md. June 1, 2023) (same). Further, Leath points to no Sixth Circuit case interpreting *Green* in this way. To the contrary, even after *Green*, the Sixth Circuit has reiterated its view that a constructive discharge simply "satisfies the adverse employment action element of [a plaintiff's] prima facie case [of employment discrimination]." *Gosbin v. Jefferson Cnty. Comm'rs*, 725 F. App'x 377, 387 (6th Cir. 2018).

Therefore, to the extent that Leath asserts an independent cause of action for constructive discharge, such a claim will be dismissed. This Court will nonetheless consider Leath's constructive discharge theory in its proper context—that is, with

respect to whether she suffered an adverse employment action, as relevant to her race and gender discrimination claims discussed below. *See* Part III.B.2, *infra*.

## B. Title VII Claims

Count I of Leath's Complaint is for "Title VII" violations. ECF No. 12 at PageID.116–17. Count I is generously construed as asserting claims for a hostile work environment, disparate treatment based on race and gender, and retaliation. Each will be addressed in turn.

### 1. Hostile Work Environment

To constitute a hostile work environment, a workplace must be "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

Here, Leath does not allege that her supervisors harassed her. Rather, her allegations focus only on her coworkers. To succeed on a hostile-work-environment claim related to coworker harassment, Leath must prove that:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [race or gender], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).

- 16 -

As explained below, there is not enough record evidence to create a triable issue as to several elements of this test. As a result, no reasonable jury could find that Leath experienced a hostile work environment, which forecloses her claim as a matter of law.

**Element 3 – Because of Race or Gender**. To start, Leath has not demonstrated that the alleged harassment she experienced was because of her race or gender. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012) ("[T]he conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's [race or] gender.").

Consider again what Leath experienced over roughly two years:

- Officers Haynes and Ettinger complained in a meeting that Leath—an external candidate—was hired before internal candidates could apply, and they shot her a mean look. ECF No. 20-2 at PageID.232–33.

- Officer Victorian called Leath "petty" for pointing out that he added ingredients to a premade salad kit and suggested that other officers did not like her. *Id.* at PageID.239.

- Officer Ettinger complained that Leath had not followed protocol with respect to handling evidence. *Id.* at PageID.243, 245; ECF No. 20-6.

- Officer Victorian did not move out of Leath's way as she was trying to access a mailbox and accused her of having a rude and confrontational attitude. ECF Nos. 20-7; 20-8.

- Officer Victorian yelled at Leath when she questioned how he filled out a warrant. ECF No. 20-2 at PageID.241, 252–53.

- Officer Haynes accused Leath of misstating her hours. ECF No. 20-11.

- Leath was issued a warning for parking illegally. ECF No. 20-14.

- Officer Haynes would not use Leath's official title for an unspecified period of time. ECF No. 20-15 at PageID.373–74.

- Officer Victorian placed two books in Leath's mailbox, which Leath believes was intended as a hurtful joke. ECF Nos. 20-17; 20-18; 20-19.

- Officer Haynes gives Leath two cold, intimidating looks. ECF No. 20-20 at PageID.413.

- Some officers described Leath as agitated, hostile, and condescending after arguing with her about proper *Miranda* procedures. ECF Nos. 20-24; 20-25; 20-26; 20-27.

For basically all of these incidents, Leath points to no record evidence suggesting that race or gender factored into what happened.[3] *See* ECF No. 22 at PageID.467–77. Moreover, Leath freely admits that "she was not called racial or

---

[3] Unfortunately, the entire "Argument" section of Leath's response is essentially devoid of any record citations. Over the span of ten pages, there are two or three citations at most. *See* ECF No. 22 at PageID.467–77. This is especially problematic at the summary judgment stage, as the Civil Rules require parties to support their factual assertions by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A). In this way, "it was [Leath's] job to point to the evidence with specificity and particularity in the relevant brief rather than just dropping a pile of paper on the district judge's desk and expecting [her] to sort it out." *Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010); *Dean-Lis v. McHugh*, 598 F. App'x 412, 415 (6th Cir. 2015) ("'Judges are not like pigs, hunting for truffles buried in' the record." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam))).

- 18 -

gender slurs to her face." *Id.* at PageID.471. These incidents, therefore, fall short of demonstrating targeted harassment based on race or gender, and more closely resemble workplace disagreements and personality conflicts. *See Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 791 (6th Cir. 2000) ("[P]ersonal conflict does not equate with discriminatory animus." (quoting *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 342–43 (6th Cir. 1998))).

Leath responds that "at least some of the harassment was based on race," pointing to a discussion where she says Officer Victorian called her hair "nappy." ECF No. 22 at PageID.475. Leath characterizes this comment as a racial slur.[4] *Id.* at PageID.464. But as Leath conceded in her deposition, Victorian—who is Black himself—was talking about *his own* hair, not Leath's. ECF No. 20-2 at PageID.242 ("[H]e was talking about his haircut . . . [saying] I don't want my hair to grow and be nappy."). Leath's argument on this point, therefore, does not persuade.

Leath further responds that coworkers "gossiped, joked, japed, and made fun of her behind her back," including one officer who would imitate her voice and how she walked behind her back. ECF Nos. 22 at PageID.471; 20-2 at PageID.234. She also notes that Officer Ettinger had never filed a report of contact against a white

---

[4] "Nappy" certainly has racial connotations. *See* Michael Paulino, *The Racial Roots Behind The Term 'Nappy,'* NPR (Aug. 9, 2019, 10:02 AM), https://www.npr.org/sections/codeswitch/2019/08/09/412886884/the-racial-roots-behind-the-term-nappy [https://perma.cc/Y2FC-EZAB].

man but had done so against her. ECF No. 22 at PageID.471. But as explained below, even if these incidents can be linked to Leath's race or gender, they were not severe or pervasive enough to create a hostile work environment.

*Element 4 – Severe or Pervasive*. Leath has also not brought forth enough evidence to suggest that the alleged harassment was sufficiently severe or pervasive to create a hostile work environment.

Title VII is not a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). For this reason, the Sixth Circuit has set a "relatively high bar" for what counts as discriminatory conduct for a hostile work environment claim. *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017). Allegations of "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not enough, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted), nor is "merely offensive" conduct, *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008).

Whether harassing conduct is sufficiently pervasive or severe is a question of fact that depends on the totality of the circumstances. *Hawkins*, 517 F.3d 333 (first quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006); and then quoting *Harris*, 510 U.S. at 23). This inquiry has both a subjective and an objective component: a plaintiff must establish "both that the harassing behavior was 'severe or pervasive' enough to create an environment that a reasonable person would find

- 20 -

objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive." *Hawkins*, 517 F.3d 333 (quoting *Harris*, 510 U.S. at 21–22). Important considerations include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

To be sure, Leath's former workplace sounds like it was far from pleasant. Leath clearly had to deal with coworkers who were sometimes offensive, petty, or downright disrespectful. But even when construing all facts in Leath's favor, the case law confirms that the conduct she describes was nowhere near severe or pervasive enough to create a hostile work environment.

The Sixth Circuit has affirmed dismissals in cases concerning conduct far more severe than anything Leath experienced in the context of gender. *See Clark v. United Parcel Serv.*, 400 F.3d 341, 352 (6th Cir. 2005) (finding no severe or pervasive conduct when male supervisor told vulgar jokes, twice placed vibrating pager on female plaintiff's thigh, and tugged at plaintiff's overalls so as to look down them, after she told him that she was wearing a thong); *Morris*, 201 F.3d at 790 (same when male supervisor often told sexual jokes, once referred to female plaintiff as "Hot Lips," once made a sexual advance at her, and several times commented on her state of dress); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000)

(same when female supervisor rubbed male plaintiff's shoulder, grabbed his buttocks, put finger on his chest, and twice invited him into hot tub and pool in sexually suggestive manner).

This is also true in the context of race-based conduct. *See Williams*, 643 F.3d at 506, 513 (finding no severe or pervasive conduct when supervisor made racist comments calling Jesse Jackson and Al Sharpton "monkeys," said Black people "should go back to where [they] came from," and asked why Black people cannot name their children "stuff that people can pronounce"); *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 327 (6th Cir. 2010) (same when Black plaintiffs' coworkers used the n-word a "handful" of times, and made "some racist jokes" and a "few" references to the Ku Klux Klan and James Earl Ray); *Artis v. Finishing Brands Holdings, Inc.*, 639 F. App'x 313, 324–25 (6th Cir. 2016) (same when Black plaintiff's coworker made "a few" potentially racist comments, a noose was hung in the workplace, and there was racist graffiti in the bathroom).

None of what Leath experienced was as egregious as what the above cases describe. Leath was not subjected to any racist or sexist slurs outright. ECF No. 22 at PageID.471. Nor does Leath suggest that she ever experienced unwelcome touching or physical harassment. *See Hawkins*, 517 F.3d at 334 ("This court has also made clear that harassment involving an 'element of physical invasion' is more severe than harassing comments alone." (quoting *Williams v. Gen. Motors Corp.*,

187 F.3d 553, 563 (6th Cir. 1999))). Consequently, the incidents Leath complains of, even when considered as a whole, fall short of being severe or pervasive enough to have altered the conditions of her employment. *Harris*, 510 U.S. at 21.

***Element 5 – Employer's Actions***. Leath has also not demonstrated that the Government failed to act when it was informed about the alleged harassment.

In effect, this element "requires a plaintiff to demonstrate a basis for holding the employer liable for the harassing conduct of an employee's coworkers." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013). For an employer to be liable, the plaintiff "must show that the employer's response to the plaintiff's complaints manifested indifference or unreasonableness in light of the facts the employer knew or should have known." *Id.* (cleaned up). Put otherwise, to avoid liability, an employer must not tolerate or condone an intolerable situation, but instead act promptly to remedy it. *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988)).

Generally, an employer's response will be adequate if its actions are "reasonably calculated to end the harassment." *Id.* at 663. Such actions may include "promptly initiating an investigation to determine the factual basis for the complaint, speaking with the specific individuals identified by the complainant, following up with the complainant regarding whether the harassment was continuing, and

reporting the harassment to others in management." *Waldo*, 726 F.3d at 814 (cleaned up); *see also Faragher,* 524 U.S. at 806 (stating that an employer may satisfy its burden if it has a "proven, effective mechanism for reporting and resolving" harassment).

Here, the Government took actions reasonably calculated to end any alleged harassment. Specifically, the Government initiated two formal inquiries into Leath's complaints, both conducted by investigators outside the Ann Arbor VA Police Department. In November 2019, Zenia Berry, an EEO Investigator from the Detroit VA, interviewed Leath and 28 other employees and examined complaints by Leath and others pertaining to the workplace culture within the Department. Berry concluded that while there were elements of tension and division within the Department, there was no hostile work environment. ECF No. 20-12.

Further, on July 27, 2020, after Leath complained to William Robinson, the regional VA police chief, Robinson and Deputy Chief LeCario Johnson conducted a second investigation, speaking to Leath and eight other Department employees, reviewing reports of contact and other evidence, and reviewing Berry's earlier report. ECF No. 20-4 at PageID.293–95. Robinson and Johnson also found no evidence to support Leath's allegations of harassment, hostile work environment or criminal acts. *Id.* at PageID.300.

Ultimately, when Leath brought complaints to the VA leadership, they were investigated. And because such investigations were "reasonably calculated to end the harassment," the Government's response was adequate. *Jackson*, 191 F.3d at 663.

Accordingly, no reasonable jury could find that Leath was subject to a hostile work environment. The claim must therefore be dismissed as a matter of law.

## 2. Race and Gender Discrimination

Leath also asserts that she was discriminated against based on her race and gender, and that this discrimination was so intolerable that she was effectively forced to resign.

***The Prima Facie Case***. There are two ways for plaintiffs to prove discrimination under Title VII. The first is by presenting direct evidence of discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000)). The second is by presenting circumstantial evidence "that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d at 864–65.

Leath does not present any direct evidence of discrimination, making this a circumstantial-evidence case, which is evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination, after which the burden shifts to the defendant to proffer a legitimate,

- 25 -

nondiscriminatory reason for its actions. *Id.* at 802. If the defendant carries this burden, then the plaintiff "must prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Johnson*, 215 F.3d at 573 (citing *McDonnell Douglas*, 411 U.S. at 802).

To establish a *prima facie* case, Leath must show that (1) she was a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) that adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)).

Here, Leath cannot establish a *prima facia* case of discrimination because she did not suffer an adverse employment action.

***Adverse Employment Action.*** An adverse employment action is a "materially adverse change in the terms or conditions of employment." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (quoting *Allen v. Mich. Dep't. of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999)). Examples include "[t]ermination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits." *Mensah v. Michigan Dep't of Corr.*, 621 F. App'x 332, 334 (6th Cir. 2015) (citing *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 625 (6th Cir. 2013)).

Leath concedes that she was never suspended, demoted, terminated, denied a promotion, or reassigned to a different position. ECF No. 20-19 at PageID.408–09. Nor did she ever have her pay cut, schedule involuntarily changed, or job responsibilities involuntarily taken away. *Id.* Rather, Leath attempts to meet the adverse-action element by arguing that her resignation was instead a constructive discharge. ECF No. 22 at PageID.468–75.

***Constructive Discharge***. A constructive discharge occurs when "the discrimination suffered by an employee was so intolerable that a reasonable person would feel compelled to resign and the employee actually did so." *Townsend v. Rockwell Automation, Inc.*, 852 F. App'x 1011, 1016–17 (6th Cir. 2021) (citing *Green v. Brennan*, 578 U.S. 547, 553–55 (2016)). Intolerability is a high bar—one that requires a plaintiff's work conditions to be "hellish, or at least close to it." *Tchankpa v. Ascena Retail Grp.*, 951 F.3d 805, 815 (6th Cir. 2020). In determining intolerability, courts consider several factors, including:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001) (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

- 27 -

Further, the intolerable conduct complained of must be linked to discrimination. *Tchankpa*, 951 F.3d at 817 n.3 ("No matter what, employees need to show that the offending workplace is somehow discriminatory."); *Benitez v. Tyson Fresh Meats, Inc.*, No. 18-CV-00491, 2022 WL 1283087, at *39 (M.D. Tenn. Apr. 28, 2022) ("[H]arassing conduct (including comments) counts towards a showing of intolerable conditions only to the extent that the conduct is based on a discriminatory motive or animus." (citing *Rickard v. Swedish Match N. Am., Inc.*, No. 12-CV-00057, 2013 WL 12099414, at *10 (E.D. Ark. Nov. 25, 2013), *aff'd*, 773 F.3d 181 (8th Cir. 2014))). For this reason, a plaintiff cannot recover if she quits over conditions equally offensive to all employees regardless of their status in a protected class. *See Tchankpa*, 951 F.3d at 816 (recognizing that there must be a "nexus" between the employee's protected class and the intolerable conditions).[5]

_____

[5]The Government also argues that for constructive discharge, Leath must further show "that [her] employer *deliberately* created the intolerable conditions to force [her] to quit." *Yanick v. Kroger Co. of Mich.*, No. 23-1439, 2024 WL 1856680, at *7 n.2 (6th Cir. Apr. 29, 2024) (emphasis added) (citing *Tchankpa*, 951 F.3d at 814). But there is an open question—yet to be addressed by the Sixth Circuit—as to whether the Supreme Court's decision in *Green* abrogated this deliberateness requirement. *See Tchankpa*, 951 F.3d at 814, 816–17; *Yanick*, 2024 WL 1856680, at *7 n.2. *But see Cooper v. Dolgencorp*, LLC, 93 F.4th 360, 373 (6th Cir. 2024) (stating, without reference to *Green*, that constructive discharge requires plaintiffs to prove that an employer "deliberately created intolerable working conditions with the intention of forcing him to quit"). So far, at least one district court in this circuit has disposed of the deliberateness requirement post-*Green*. *See Benitez*, 2022 WL 1283087, at *38 (citing *Everly v. Everly*, 958 F.3d 442, 463 (6th Cir. 2020) (Murphy, J., concurring)). But here, this Court need not address the deliberateness question because, as will be explained, Leath's constructive discharge claim fails regardless.

Here, Leath argues that she was constructively discharged because she was subjected to a hostile work environment. ECF No. 22 at PageID.468–75. But because Leath's hostile work environment claim fails as a matter of law, *see* Part III.B.1, *supra*, her constructive discharge claim does too. *McDaniel v. Wilkie*, No. 19-3304, 2020 WL 1066007, at *4 (6th Cir. Jan. 31, 2020) ("To the extent that [the plaintiff's] constructive-discharge claim relied on the VA having a hostile work environment, because there is no genuine dispute that she failed to establish the latter claim, the same holds for the former."); *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more [than a hostile-work-environment claim]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign.").

Accordingly, no reasonable jury could find that Leath's working conditions were so intolerable as to compel her resignation. This means that Leath was not constructively discharged, and her disparate treatment claim fails as a matter of law.

### 3. Retaliation

Leath's Complaint mentions retaliation only once, stating: "The actions of the Defendant denied Plaintiff the right to work in an environment free from retaliation in the form of 'record of contact.'" ECF No. 12 at PageID.116. To the extent that Leath attempts to assert a retaliation claim, such a claim fails.

First, this is because Leath did not exhaust a retaliation claim. *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991) ("The right to bring an action under Title VII regarding equal employment [opportunity] in the federal government is predicated upon the timely exhaustion of administrative remedies, as set forth in [the EEOC regulations]."). "Failure to [comply with the administrative exhaustion requirements] is cause for dismissal by the agency as well as by the district court." *Steiner v. Henderson*, 354 F.3d 432, 435 (6th Cir. 2003) (citations omitted); *see also Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009) (recognizing that failure to follow the EEO process in a timely manner is independent grounds for dismissal of Title VII discrimination claims).

The applicable regulations require that a complainant "describe generally the action(s) or practice(s) that form the basis of the complaint." 29 C.F.R. § 1614.106(c). However, Leath's EEO complaint, ECF No. 20-29, the investigative report, ECF No. 20-22, the final agency decision, ECF No. 20-30, and the final EEOC decision, ECF No. 20-31, do not mention a retaliation claim in any way. Such a claim is therefore barred for lack of exhaustion.

But even if the claim were not barred for lack of exhaustion, Leath abandoned it by failing to respond to the retaliation-related arguments the Government made in its motion for summary judgment. *See* ECF No. 20 at PageID.219–21; *Brown v. VHS of Mich., Inc.*, 545 F. App'x. 368, 372 (6th Cir. 2013) (collecting cases) ("This

- 30 -

Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

Therefore, to the extent that Leath asserts a retaliation claim, it will be dismissed.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 20, is **GRANTED**. Plaintiff's Second Amended Complaint, ECF No. 12, is **DISMISSED WITH PREJUDICE**.

**This is a final order and closes the above-captioned case**.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: March 31, 2025

- 31 -